SCOTT ERIK ASPHAUG, OSB #833674
Acting United States Attorney
District of Oregon
**SETH D. URAM, DC # 376214**
**MEREDITH D.M. BATEMAN, OSB # 192273**
Assistant United States Attorneys
Seth.Uram@usdoj.gov
Meredith.Bateman@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:18-cr-00180-SI** |
| | **3:19-cr-00244-SI** |
| v. | |
| | **GOVERNMENT'S SENTENCING** |
| **ROBERT A. LUND,** | **MEMORANDUM** |
| Defendant. | |

## I.    GOVERNMENT'S SENTENCING RECOMMENDATION

The government files this sentencing memorandum in the above-captioned cases, and

requests that the Court sentence Robert A. Lund to 41 months imprisonment.  Over fifteen years,

Lund used 31 nominees to hide his wealth from the IRS and evade paying $1,745,710.06 in

personal income taxes.  During that time, Lund failed to file personal income tax returns,

engaged in a multi-year letter writing campaign threatening IRS employees and making frivolous

arguments, filed two bogus personal bankruptcy cases to stop IRS collection efforts, and lied

under oath during a bankruptcy proceeding.  In the last three years of his tax evasion conduct,

though Lund owned real estate worth over $1.5 million and had a personal income of over $10,000 per month, he applied for and received food stamp and Medicaid benefits by telling state authorities he was a part-time handyman who earned $810 per month.

In the last 15 years in the District of Oregon, 21 defendants have pleaded guilty to and have been sentenced for tax evasion. Every one of these 21 defendants who did not have significant mitigating factors, and even several who did, was sentenced to more than one year in prison. Lund caused a tax loss greater than every one of these 21 defendants, his tax evasion conduct was more extreme, or at least on par with the most egregious of them, and he has no mitigating factors, so the Court should sentence him to a significant term of imprisonment.

## II.    PROCEDURAL POSTURE

On April 24, 2018, a federal grand jury returned an Indictment charging Lund with making false statements in his 2013 bankruptcy case, in violation of 18 U.S.C. § 152(2) (Case No. 3:19-cr-00180-SI). On June 12, 2019, the grand jury returned an Indictment charging Lund with evading the payment of $1.7 million in income taxes, in violation of 26 U.S.C. § 7201 (Count One), with failing to file personal income tax returns for 2013 and 2014, in violation of 26 U.S.C. § 7203 (Counts Two and Three), with obstructing and impeding the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a) (Count Four), and with stealing federal funds in the form of Medicaid benefits and food stamps, in violation of 18 U.S.C. § 641 (Counts Five and Six) (Case No. 3:19-cr-00244-SI). On November 7, 2019, the Court ordered the two cases be consolidated.

On July 19, 2021, defendant Lund pleaded guilty to Count One of the Indictment in Case No. 3:19-cr-00244-SI, Tax Evasion (1994-1996), Counts Two and Three of the Indictment in Case No. 3:19-cr-00244-SI, Failure to File Individual Tax Return – 2013 (Count Two) and

Failure to File Individual Tax Return – 2014 (Count Three), and Counts Five and Six of the Indictment in Case No. 3:19-cr-00244-SI, Theft of Government Funds.

Sentencing for the defendant is scheduled on November 15, 2021, at 10:00 a.m.

## III.   OFFENSE CONDUCT

### A.  **Background**

The IRS conducted a long, detailed investigation of Lund's conduct.  That investigation produced evidence establishing the following:

From the late 1970s to the mid-1980s, Lund worked as a computer engineer and programmer, principally for the Hewlett Packard company.  Lund moved to Oregon after he left Hewlett Packard and started a computer consulting company called Lund Performance Solutions (LPS).  LPS's clients included large businesses, school districts, colleges, and health care companies throughout the United States that used Hewlett Packard computer systems.  LPS increased the capacity and efficiency of those systems by leasing or selling software products Lund created and by providing consulting services.

LPS became profitable almost immediately.  In 1993, to shield his LPS profits from taxation, Lund paid $30,000 to an off-shore trust promoter to establish layers of trusts to hide his LPS profits from the IRS.

In 1994, 1995, and 1996, Lund filed personal income tax returns that reported almost no LPS income.  The IRS audited Lund's tax returns and assessed him about $2.7 million in taxes, plus penalties.  During this three-year period, LPS had gross income of $5.3 million and net income of $1.2 million, all of it taxable to Lund.  Lund used these profits, and profits in later years, to buy 90 acres of land outside Eugene, Oregon.[1]  On this property he built a 7,000 square

---

[1] 39662 Mt. Hope Drive, Lebanon, OR.  [*See* Ex. 4].

foot house with 7 bedrooms and 6 bathrooms that was appraised at $850,000 and $975,000 in 2005 and 2015, respectively.  [Ex. 1; Ex. 2].  Lund, a licensed pilot, also built a private landing strip on the property for his two old small airplanes.

Lund's LPS success also allowed him to buy the former city hall and post office building in downtown Albany, Oregon (the Albany building) [Ex. 3],[2] a trailer park with single-wide and double-wide rental units,[3] and two rental houses.[4]  Lund ran LPS and several smaller businesses from the Albany building.

Lund challenged the IRS tax assessments for 1994, 1995, and 1996 in U.S. Tax Court.  In October 2000, the Tax Court ruled Lund's trust set-up was a sham and upheld the assessments. [Ex. 9, p. 12 ("The only recognizable purpose for the formation of Zero Gee [trust] was tax avoidance.  For $30,000, petitioner purchased a sham trust package supported by no economic substance.  We conclude that . . . the net income of Zero Gee is taxable to petitioner.")].  In March 2001, the Tax Court issued a decision that Lund owed about $445,000 in additional taxes for 1994, 1995, and 1996, plus about $89,000 in penalties.  [Ex. 10].

Lund appealed the Tax Court decision to the Ninth Circuit Court of Appeals.  In June 2002, the Ninth Circuit affirmed the Tax Court's decision that Lund's trust set-up had been a sham and that he owed those taxes and penalties.  [Ex. 11].

/ / /

/ / /

/ / /

---

[2] 240 2nd Ave., Albany, OR.  [*See* Ex. 5].
[3] 4610 Highway 20, Sweet Home, OR.  [*See* Ex. 6].
[4] 329 Pine Street, Albany, OR.  [*See* Ex. 7]; 38960 Mountain Man Lane, Lebanon, OR.  [*See* Ex. 8].

Shortly after the Tax Court decision, the IRS sent Lund a bill for the taxes he owed. In response, Lund stopped filing tax returns and began the tax evasion conduct with which he is charged and to which he has pleaded guilty.[5]

### B. Offense Conduct – Count One (Tax Evasion – 1994, 1995, 1996)

### 1. Lund Transferred Title of His Real Properties to Nominees

Lund never paid the taxes he owed for 1994 through 1996. Less than two months after the IRS sent Lund a bill for over $500,000 in income taxes for 1994-1996, Lund created the first of many limited liability companies (LLCs) and trusts he used to conceal his income and assets from the IRS. Lund immediately transferred title to his home, the Albany building, and his two stand-alone rental properties to this first concealment LLC. [*See* Ex. 4 (Timeline 39662 Mt. Hope); Ex. 5 (Timeline 240 2nd Ave); Ex. 7 (Timeline 329 Pine); Ex. 8 (Timeline 38960 Mtn. Man)].

Records Lund provided in reciprocal discovery appear to show Lund had the assistance of a tax protestor attorney from Georgia named Kyle Weeks, who later surrendered his bar license and was convicted of filing false personal tax returns. In his plea agreement, Lund admits he made these transfers to conceal these properties from the IRS so the IRS could not seize and sell the properties to satisfy his income tax debt. [Dkt. No. 82 (Plea Agreement), ¶6]

To stay ahead of the IRS and further evade payment of personal income taxes Lund owed for 1994 through 1996, he continued to transfer title to his properties to other straw entities or people. Lund transferred title to his home to a second straw entity (a bogus partnership), then back to himself for one week so he could apply for and get a $500,000 loan with the property as

---

[5] *See* Ex. 12 for a master timeline of events detailing actions taken by Lund, the IRS, and courts from 1993 until 2015.

collateral, then back to the straw partnership, then to his father.  [Ex. 4 (Timeline 39662 Mt. Hope)].  He transferred title to the Albany building to a second straw entity, then to his father. [Ex. 5 (Timeline 240 2nd Ave.)].  And in 2007, two weeks after the IRS sent Lund a bill for $1.2 million for his 1994-1996 income taxes, he transferred title of his trailer park from a straw entity to a now-deceased tax protestor named Thomas Brissey, who lived in Georgia.  [Ex. 6 (Timeline 4610 Hwy 20); *see also* Ex. 12, entries 9/4/2007 and 9/27/2007].  Altogether, Lund transferred title to his properties to five nominee entities and three individuals to prevent the IRS from seizing and selling the properties to satisfy his income tax debt for 1994 through 1996.  [Ex. 13]. Lund admits this in his plea agreement.  [Dkt. No. 82 (Plea Agreement), ¶6]

### 2.  Lund Sent the IRS Frivolous and Threatening Correspondence

In 2001, immediately after the IRS sent Lund his first bill for his 1994, 1995, and 1996 taxes, Lund began a correspondence campaign to further evade payment of his taxes and to stop the IRS's efforts to collect payment of his taxes and to calculate the taxes he owed for later years.  [Ex. 14; *see also* Ex. 15].  The IRS sent Lund letters, bills, and summonses for financial records and Lund replied with letters saying he was not subject to taxation because he was not a U.S. citizen, that the Internal Revenue Code did not require him to pay taxes, and that the IRS was not legitimate and had no authority over him.  [Ex. 14; *see also* Ex. 15].  In some of these letters, Lund threatened to sue IRS personnel and stated or implied they could be prosecuted for crimes they supposedly committed against him.  Lund sent 18 of these letters.  [Ex. 14; Ex. 15].

/ / /

/ / /

/ / /

/ / /

The below chart provides samples of Lund's letters.

| Exhibit | Entry Date | Lund Statement/Quote |
|---------|-----------|---------------------|
| 15 | 5/11/2006 | Robert A. Lund is not a U.S. citizen. Robert Lund has not contracted with the IRS and the IRS has no claim against him. The IRS does not have any authority to compel Robert Lund to perform any act. |
| 15 | 10/7/2007 | I am not a UNITED STATES citizen nor am I a resident of OREGON. I am not subject to income taxes. I deny ever participating in any trade or business. |
| 15 | 6/25/2009 | I am not liable for or subject to personal income tax. |
| 15 | 7/13/2009 | IRS Revenue Agents Seal and Cook are posing as officers or agents.<br><br>"No where in the code is there a tax on my labor." |
| 14 | 3/5/2010 | The IRS Revenue Agent only has authority to issue summons pertaining to liquor, tobacco, and firearms and thus has "violated, poisoned, and COMPLETELY DESTROYED" the District Court's jurisdiction by exceeding such authority. |
| 14 | 5/4/2012 | Collecting taxes after ten years will result in Lund filing suit personally against the IRS Revenue Officer for damages. |

One consistent argument Lund made in his correspondence campaign was that he did not owe taxes because he was not a United States citizen. [*See* Ex. 14; Ex. 15]. The evidence shows Lund did not believe this argument because during the same time period, Lund repeatedly admitted his United States citizenship in government documents in order to vote, and to maintain his passport and pilot license. [*See* Ex. 16 (Lund's 1994 passport application declaring "I have not, since acquiring United States citizenship . . . made a formal renunciation of my nationality"); Ex. 17 (Lund's 2004 passport application with same declaration); Ex. 18 (Lund's 1999 voter registration card checking "Yes" to the question of "Are you a U.S. Citizen?"); Ex. 19 (Lund's 2015 pilot license application stating "Citizenship: USA"); Ex. 20 (Lund's 2018 pilot license application stating "Citizenship: USA"); *see also* Ex. 14, entry 3/5/2010 (letter from Lund to IRS stating "[A]s a citizen of the United States of America I have certain and specific . .

. rights guaranteed to me under the Constitution[.]")].[6] These contradictory statements show Lund always knew he owed taxes despite claiming he was not a United States citizen—this was simply one of his attempts to obstruct the IRS and evade payment.

### 3. Lund Filed Frivolous Court Documents

Also in response to the IRS collection efforts, Lund filed frivolous court documents [Ex. 22; Ex. 97; Ex. 24; Ex. 25], and sued or sent frivolous letters to third-parties in an effort to quash legitimate IRS summonses and subpoenas. [Ex. 26; Ex. 27; Ex. 28].

For instance, in April 2011, an IRS Revenue Agent served Lund with a summons requiring him to produce his financial records. [Ex. 29]. Lund immediately sent the IRS a "legal petition to quash non-judicial IRS summons" arguing, among other things, that the IRS was "only attempting to harass [him] by the issuance of the instant summons and is plainly exceeding the true legal authority possessed." [Ex. 30].

Despite multiple court orders saying Lund's arguments were frivolous, Lund failed to produce the records. [Ex. 31 p. 6 (December 2011 order holding Lund "failed to postulate a legally sufficient challenge or defense" because "all of [his] arguments [are] related to a provision of the Internal Revenue Code that is not germane to this enforcement action"); Ex. 32 (February 2012 order denying Lund's motions to dismiss); Ex. 33, 18:25-19:1 (April 2012 transcript of show cause hearing where Judge Aiken stated "I am ordering that you provide the documents as requested")].

In February 2013, District Judge Aiken wrote that the court had "found, repeatedly, that the IRS summons is enforceable and that [Lund] must produce the documents sought. [Lund]

---

[6] In his 2014 passport application, Lund attached an "Affidavit of Nationality" in which he "declare[d his] proper and lawful status of dual citizenship with respect to 'national' and 'state' Citizenship." [Ex. 21]. The State Department then revoked Lund's passport. [Ex. 22].

has floated the court's order in the past, and his submission of documents completely unresponsive to the IRS summons is simply more of the same." [Ex. 34, p. 4]. Accordingly, the court ordered Lund to produce documents within 14 days. [Ex. 34, p. 4]. He did not comply.

Despite such an order, Lund continued to file frivolous petitions to quash and filed suit against third parties who complied with legitimate IRS subpoenas and summonses. [Ex. 24 (September 2013 Petition to Quash I.R.S. Subpoena filed by Walter Lund); Ex. 25 (February 2014 Motion to Quash Subpoena filed by Walter Lund; Ex. 26 (*Lund v. Chase Bank*, Case No. 14cv01084 filed in February 2014 for $3,000,000 for "violations of contract and Constitutional rights" based on Chase Bank's compliance with the IRS summons)]. Lund also sent letters to third parties that had received subpoenas and summons encouraging them not to comply with the summons and stating,

> the I.R.S. and United States Justice department today are no longer honorable institutions, but rather have become abusive and unlawfully politicized operations in the United States of America that have no regard for the written law, routinely operate outside the law as a matter of *defacto* operations[.]

[Ex. 27 (August 2014 letter from Lund to Health Plan of the Upper Ohio Valley); Ex. 28 (August 2014 letter from Lund to NPD Group)].

### 4. Lund Opened Nominee Bank Accounts To Deposit His Income and Pay Personal Expenses

To further evade payment of the personal income taxes he owed for 1994, 1995, and 1996, Lund transferred his personal computer consulting income profits to five business entities, and opened bank accounts in the names of these entities. [Dkt. No. 82 (Plea Agreement), ¶6; *See* Ex. 13; Ex. 35]. For example, Lund deposited approximately $8,000 to $12,000 per month of computer consulting income into a bank account for Premium Consulting Limited. [Ex. 36; Ex. 37; *see also* Ex. 38]. From January to November 2007, Insight Technology Group (Lund's

computer consulting company) wrote checks totaling $234,890.62 to Premium Consulting. [Ex. 38; Ex. 64].

Lund rented most of his properties (the units in his trailer park and two small houses) to low-income tenants participating in rental assistance programs. While Lund received some rental checks in his own name [*See e.g.*, Ex. 39],[7] to hide from the IRS his ownership of, and rent income from, these rental properties, Lund signed up with the rental assistance programs in the name of eighteen (18) straw LLCs, partnerships, and trusts. [*See* Ex. 13; Ex. 35; Ex. 41; Ex. 42]. Lund opened bank accounts in the names of eight of these entities to receive the rental payments.[8] [Ex. 42]

From March 2012 to March 2014, Lund used an entity he called Real Estate Rental Account Ventures Trust ("Real Estate Rental")[9] to receive low income rent payments for some of the units in his trailer park. [*See* Ex. 52]. In January 2012, Lund convinced an associate, Jeremiah Hart, to call himself the sole trustee and to open a bank account in the name of the trust. [Ex. 46].[10] Other than going to the bank with Lund and signing for the account, Hart had no other connection to this bank account. [Ex. 53, ¶20 (June 2021 Hart Interview)]. Lund kept a

---

[7] Lund also repeatedly sued tenants in his own name for breaching the rental agreements. [Ex. 40].

[8] Despite the substantial rental income Lund received, he kept the properties in a state of disrepair. Tenants described Lund as a "slumlord" and one tenant explained his wife "broke into tears" upon first seeing the trailer they had rented because it had "no power and had a noticeable foul odor." [Ex. 43; Ex. 44].

[9] Lund referred to this entity by various names (Real Estate Rental Account Ventures, Real Estate Rental Account Ventures 2100, Real Estate Rental Account Venture 2105, and Real Estate Rental Account Ventures 2200). [*See* Ex. 45; Ex. 46; Ex. 47; Ex. 48; Ex. 49; Ex. 50; Ex. 51]. Lund filed W-9s for these entities and signed low-income housing documentation for them either in his own name or as "TTE," "agent," or "landlord." [*Id.*] All of these entities shared the same address and all low-income housing payments for these entities went into the Real Estate Rental Account Ventures Trust bank account opened by Hart ending in 0092. [*Id.*; Ex. 52].

[10] The tax protester attorney from Georgia, Kyle Weeks, who later surrendered his bar license and was convicted of filing false personal tax returns, prepared the trust. [Ex. 46].

debit card for the Real Estate Rental bank account. [Ex. 53, ¶20]. After low-income rental payments started to hit the account via electronic transfer, Lund used the debit card to pay business and personal expenses and to regularly withdraw cash from ATMs. [Ex. 52 (deposit and withdrawal analysis of Real Estate Rental bank account)]. Lund typically withdrew between $400 and $1,600 in cash each week. [Ex. 52]. Between March 2012 and March 2014, Lund received approximately $55,000 via the Real Estate Rental bank account from rental assistance programs and made approximately $19,000 in cash withdrawals. [Ex. 42].

Then Lund switched entities and bank accounts for this rental income stream for March 2014 through December 2016. [Ex. 54; Ex. 55]. He had Eugene Pringle open a bank account in the name of White Rapids Holdings LLC ("White Rapids") [Ex. 56], and directed the low-income rental assistance program to switch direct deposit of rent payments from the Real Estate Rental bank account to the White Rapids bank account. [Ex. 54; Ex. 55; Ex. 57; Ex. 58; Ex. 59; Ex. 60]. Pringle gave Lund the debit card for the White Rapids bank account and Lund used the debit card to pay business and personal expenses and to regularly withdraw cash from ATMs. [Ex. 61, ¶9 (June 2021 Pringle Interview); Ex. 62 (deposit and withdrawal analysis of White Rapids bank account)]. Lund typically withdrew between $400 and $1,000 in cash each week and used some of the remaining funds to buy supplies from Home Depot or groceries. [Ex. 62]. Between April 2014 and December 2016, Lund received approximately $112,000 via the White Rapids bank account from rental assistance programs and made approximately $100,000 in cash withdrawals.[11] [Ex. 62].

---

[11] As described *infra*, during most of this time period, Lund falsely told the Oregon Department of Health and Human Services that he earned only $810 per month as a part-time handyman at the trailer park so he could fraudulently obtain food stamps and Medicaid benefits.

Lund admits that he conducted these transactions to conceal this rental income from the IRS to evade payment of his income taxes for 1994, 1995, and 1996. By December 2016, the income taxes Lund evaded for 1994, 1995, and 1996 was $1,745,710.06. [Dkt. No. 82 (Plea Agreement), ¶6]

**5. Lund Filed Petitions for Bankruptcy and Made False Sworn Statements**

To stop foreclosure on his home and to further evade payment of the personal income taxes he owed for 1994, 1995, and 1996, Lund twice filed Chapter 13 bankruptcy cases to stop IRS collection efforts. [Ex. 65; Ex. 66]. On both petitions, despite owning a home worth approximately $950,000,[12] the former post office worth $450,000 [Ex. 67], the trailer park, and two stand-alone rental properties, Lund estimated his assets to be less than $50,000. [Ex. 65; Ex. 66; *see also* Ex. 68]. Also on both petitions, despite multiple federal court opinions to the contrary, Lund estimated his liabilities to be less than $50,000. [Ex. 65; Ex. 66; Ex. 9; Ex. 10; Ex. 11; Ex. 93].

During his second bankruptcy case, in April 2013, Lund falsely testified under oath in a Meeting of Creditors hearing that he did not owe federal income taxes, had never owned or operated a business, and that he and his family lived in the Albany building instead of admitting he lived in his $950,000 home in Lebanon. [Ex. 69].[13] Shortly after the meeting of creditors, Lund's bankruptcy petition was dismissed because Lund's "tax debt exceeds code eligibility limits" and he failed to "appear and prosecute the case." [Ex. 70].

**C. Counts Two and Three (Failure to File Personal Income Tax Returns – 2013 and 2014)**

/ / /

/ / /

---

[12] The home was appraised for $850,000 in 2005 and $975,000 in 2015. [Ex. 2; Ex. 1].
[13] For the Court's reference, the false statements have been highlighted in Ex. 69.

Though Lund earned substantial rental income and computer consulting income from 2001 through 2016, he failed to file personal tax returns for those years. He pleaded guilty to willfully failing to file personal income tax returns for 2013 and 2014.

In 2013, Lund earned a total of $169,842.03 ($119,207.03 in computer consulting income and $50,635 in rental income). [Ex. 71; Ex. 72; Ex. 68]. In 2014, Lund earned $169,145 ($102,784 in computer consulting income and $66,361 in rental income). [Ex. 73; Ex. 74; Ex. 68]. Despite this income, Lund admits he willfully failed to file personal income tax returns for 2013 and 2014. [Dkt. No. 82 (Plea Agreement), ¶6]

### D. Counts Five and Six (Theft of Government Benefits)

As if all this weren't enough, in July 2012, Lund applied for food stamps and Medicaid for himself and his family—benefits intended for needy Oregonians.[14] [Ex. 75]. Between July 2012 and December 2014, Lund earned between $6,008 and $28,806 per month through his computer and rental income streams. [Ex.76 (Income Analysis 2012-2014); Ex. 68 (Lund's 2013 income was $169,842.03 and 2014 income was $169,145); *see also* Ex. 77 (Lund's February 2012 mortgage application to American Home Mortgage reporting his monthly income as $10,115); Ex. 78 (April 2012 letter from Lund to Umpqua Bank reporting his monthly income between December 2011 and February 2012 as between $11,673 and $18,034)].

---

[14] The Oregon Health Plan administers Medicaid for the State of Oregon and receives funding from the United States Department of Health and Human Services. The Oregon Department of Human Services administers the Supplemental Nutrition Assistance Program (SNAP) and receives funding from the United States Department of Agriculture. Medicaid provides health coverage and SNAP provides food-purchasing assistance for low and no-income people living in Oregon. 61% of the funds Oregon's Medicaid program pays in health care benefits comes from federal funds. 100% of SNAP benefits comes from federal funds.

During this time period, Lund operated several businesses, earned income well above the maximum to qualify for benefits, and withdrew between $400 and $1,200 per week in cash from the Real Estate Rental and White Rapids accounts. [Ex. 52; Ex. 62]. Despite this, Lund told the food stamp and Medicaid programs he worked as a part-time handyman in a trailer park (which he reported Thomas Brissey owned) and, for most of the time he received benefits, reported he earned only $810 per month. The chart below details the false statements Lund made to receive these benefits:

| Exhibit | Date | Monthly Income | Housing Payment | Cash in Bank |
|---------|------|----------------|-----------------|--------------|
| 75 | July 2012 | $2,200 (self-employed) | $4,100 (mortgage) | N/A |
| 79 | April 2013 | $1,100 ("odd jobs related to property management" $800 (net) | N/A | $0 |
| 80 | June 2013 | $800 (self-employed) | $0 | $122 |
| 81 | October 2013 | <$2,277 | N/A | N/A |
| 82 | December 2013 | $810 ("odd jobs") | $400 (rent) | N/A |
| 83 | June 2014 | $810 (self-employed) | $400 (rent to father) | $122 |
| 84 | June 2014[15] | $810 | N/A | N/A |
| 85 | December 2014 | $810 ("laborer") | $400 (rent) | N/A |

In an attempt to legitimize his false statements, Lund had Thomas Brissey send "proof of income" letters supporting his applications in which Brissey made false statements. The chart below details the false statements Lund had Brissey make in order to receive benefits:

| Exhibit | Date of Letter | Income Period | Monthly Income | Employment |
|---------|----------------|---------------|----------------|------------|
| 86 | December 2013 | July 2012-October 2012 | $2,200 | N/A |
| 86 | December 2013 | November 2012-April 2013 | $962 | N/A |

[15] This affidavit declared Lund "received cash payments with no receipts in the amount of $810.00 in the last month, and previous month" and that Lund does "not deposit funds in a bank, but rather pay[s] for various things with cash."

| 86 | December 2013 | May 2013-December 2013 | $810 | "odd jobs performed (light maintenance, mowing, repair, landscaping, managing accounts resources, etc.)" |
|----|---------------|------------------------|------|----------------------------------------------------------------------------------------------------------|
| 87 | June 2014 | "year 2013"-May 2014 | $810 | "odd jobs performed (light maintenance, mowing, repair, landscaping, managing accounts resources, etc.)" |
| 87[16] | June 2014 | April 2013-June 2014 | $810 | "similar work" |
| 88[17] | December 2014 | "year 2013"-November 2014 | $810 | "odd jobs performed (light maintenance, mowing, repair, landscaping, managing accounts resources, etc.)" |

Based on these false statements and others, Lund received food stamp benefits until December 2015 and Medicaid benefits until December 2016.[18]  Lund stole a total of $51,039.35 in Medicaid benefits, of which $31,132.17 was federal funds.  [Ex. 90].  He stole a total of $19,059.00 in food stamp benefits, all of which was federal funds.  [Ex. 90].  The combined loss for both programs, including the Oregon Medicaid funds, is $70,098.35.  [Dkt. No. 82 (Plea Agreement), ¶6; Ex. 90].

/ / /

/ / /

---

[16] This letter attaches a "Ledger for Robert Lund," which Lund signs, reporting $810 per month between July 2013 and June 2014 for "Maint, repair, Landscape, etc" and "Mgmnt, repair, indoor inspect, orc, etc".

[17] This letter attaches a "Ledger for Robert Lund," reporting $810 per month between July 2013 and November 2014 for "Maint, repair, Landscape, etc" and "Mgmnt, repair, indoor inspect, orc, etc".

[18] In August 2015, while he was receiving food and Medicaid benefits, in order to obtain a home loan Lund reported to Ocwen Loan Servicing that he made $12,400 per month.  [Ex. 89].

## IV.     TAX LOSS CALCULATION

USSG section 2T1.1(c)(1) defines tax loss in tax evasion cases as "the total amount of loss that was the object of the offense."  Application Note 1 explains that in willful evasion of payment cases (Count One here) tax loss includes interest and penalties.  The IRS has calculated the interest and penalties Lund owed to the date of his most recent affirmative act to evade payment of his income taxes so Lund's total tax loss for sentencing purposes for the years 1994, 1995, and 1996 is $1,745,710.06.  Lund admits in his plea agreement that he evaded this amount.  This loss is alleged in Count One of the Indictment and corresponds to a base offense level of 22.  *See* USSG section 2T4.1(I).[19]

As explained *supra*, despite his substantial income, Lund did not file tax returns for 2013 and 2014.  The plea agreement does not address the tax loss for 2013 and 2014 and the government is not requesting the Court include the tax loss for 2013 and 2014 in the sentencing calculation.

## V.     INCREASE FOR USE OF SOPHISTICATED MEANS

The Court should increase Lund's guideline calculation for Counts One, Two, and Three because he used a sophisticated tax cheating scheme to evade paying his taxes and in his willful failure to file income tax returns.  Lund admits in his plea agreement he used sophisticated means to evade his income taxes and that this enhancement applies.  Dkt. No. 82 (Plea Agreement, ¶7].  The Probation Office agrees this enhancement applies.  [PSR, ¶51].

---

[19] Application Note 1 further explains that tax loss "is to be determined by the same rules applicable in determining any other sentencing factor.  The most prominent of these rules is that the government need only prove the tax loss amount by a preponderance of the evidence.  *See* USSG section 6A1.3, comment ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

Guideline section 2T1.1(b)(2) tells the Court to increase a tax cheating defendant's guideline calculation by two levels "[i]f the offense involved sophisticated means." Application Note 5 says "'***sophisticated means***' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."

The government's investigation established Lund:

- Used 31 nominee entities and people to conceal from the IRS his income and assets, among them his $950,000 home, his $500,000 office building, and over 20 rental units;

- Deposited income to, and paid personal expenses using a debit card and cash withdrawals from, the Real Estate Rental nominee bank account between March 2012 through March 2014; and

- Deposited income to, and paid personal expenses using a debit card and cash withdrawals from, the White Rapids nominee bank account between March 2014 through December 2016.

This is exactly the use of fictitious entities and nominees to cheat on taxes the Ninth Circuit and the Sentencing Commission say deserves enhanced punishment. "Conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *United States v. Jennings,* 711 F.3d 1144, 1145 (9th Cir. 2013) (agreeing with other circuits that the list in the application note is not exhaustive and that the enhancement applies to conduct less sophisticated than the list articulates). *See also, United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008) (upholding sophisticated means enhancement when defendant incorporated shell companies to hide assets and had nominee people sign on real estate purchases to avoid his name being on the documents); *United States v. Thomsen*, 830 F.3d 1049, 1073 (9th Cir. 2016) ("using a bank account with a deceptive name to conceal income warranted

the enhancement, even if the scheme was not 'highly complex' and did not 'exhibit exceptional brilliance'") (quoting *Jennings*, 711 F.3d at 1145)).

## VI.     ACCEPTANCE OF RESPONSIIBLITY

The government recommends a two-level reduction in defendant Lund's offense level under USSG § 3E1.1(a) if the defendant fully admits and accepts responsibility for his unlawful conduct.  The exhibits Lund attached to his Financial Statement suggest Lund may lean on his claim that he relied on the advice of Kyle Weeks (the tax protester attorney from Georgia who later surrendered his bar license and was convicted of filing false personal tax returns) or others when he requests leniency.  *See* Financial Statement, Exhibit C ("obtained and paid for multiple counsel(s) who instructed me in ordering my affairs"; "after paid counsel from attorney G. Kyle Weeks, properties owned were transferred to his trust LLC"; "over the years, and under the counsel of Weeks and others, various properties were transferred into other entities and various persons.").  When Lund pleaded guilty to evading payment of his income taxes, he admitted he engaged in his tax evasion conduct *willfully*, meaning that he voluntarily and intentionally violated his known legal duty to pay his income taxes.  Instruction 9.42, 9th Cir. Model Criminal Jury Instructions.  If Lund asserts his supposed reliance on "Weeks and others" made his tax evasion conduct less than voluntary or less than intentional, he will not be accepting responsibility for his criminal conduct, and the government may not recommend a two-level reduction under USSG § 3E1.1(a).

The government does not recommend an additional one-level reduction in Lund's offense level under USSG §3E1.1(b) because Lund did not timely notify the government of his intention to enter a plea of guilty and did not permit the government to avoid preparing for trial and

allocate its resources efficiently.[20]  *See* USSG § 3E1.1, comment 6 ("to qualify under subsection (b), the defendant must have notified authorities of his intention to enter a plea of guilty at a sufficiently early point in the process so that the government may avoid preparing for trial and the court may schedule its calendar efficiently."); *United States v. Hopper*, 27 F.3d 378, 385 (9th Cir. 1994) ("If the Government has already spent considerable time and effort preparing for trial and is at least substantially prepared to present its case, then the decision is not timely enough to promote prosecutorial efficiency or economy."); *United States v. Tory*, 1997 U.S. App. LEXIS 29161, *6 (9th Cir. Oct. 9, 1997) ("Because the government had already engaged in meaningful trial preparations (shown by the filing of its trial memorandum) and [defendant's] attempt to enter his plea came so close to trial, [defendant] does not meet the 'timely' requirement under § 3E1.1(b)(2).").

Lund entered his guilty plea on July 19, 2021, a week after the government filed its first set of pre-trial documents and exhibits, and only three weeks before trial.  At that point, the government had already engaged in meaningful trial preparation, including 24 witness preparation sessions with 23 witnesses in Eugene and Portland (not including numerous sessions with its two IRS agent witnesses), the finalization of over 200 trial exhibits, and the filing of the government's exhibit list, amended exhibit list, witness list, jury instructions, voir dire questions, verdict form, trial brief, and motions *in limine* to exclude evidence.  Because the government was trial-ready, Lund is not entitled to an additional one-level reduction in his offense level under USSG §3E1.1(b).

/ / /

---

[20] As explained *infra* ("Objections to the Presentence Report"), the government objects to the presentence report's recommendation of an additional one-level reduction under USSG § 3E1.1(b).

## VII.    HISTORY AND CHARACTERISTICS OF DEFENDANT

Three things show Lund's true self: his willingness to dodge the IRS for 15 years, his theft of public benefits from needy Oregonians while making between approximately $6,000 and $29,000 per month [Ex. 76], and his making false statements about his income and assets to multiple courts in affidavits he filed.  Lund's tax evasion conduct and his theft of government benefits are set out above so this section focuses on Lund's willingness to lie to state and federal courts.

Lund's willingness to lie in court documents about his income and knowledge of IRS liabilities gives the Court insight into who he really is.  In April 2006, the IRS seized and sold to Mark and Kathleen Halvorsen a property Lund formerly owned in Deschutes County.  Shortly thereafter, Lund sued the Halvorsens and, in February 2007, Lund filed a Response in Opposition to Defendant's Motion for Summary Judgment in Case No. 06CV-337ST in the Circuit Court of the State of Oregon for the County of Deschutes.  [Ex. 91].  In support of this motion, Lund submitted an affidavit that stated under penalty of perjury, that he and his wife were "not in receipt of any document that establishes we have a liability to the United States government for any tax claimed."  [Ex. 91].  This statement was false because as of February 2007, the U.S. Tax Court and the Ninth Circuit Court of Appeals (in three separate opinions) had held that Lund was liable for taxes and penalties for 1994, 1995, and 1996.  [Ex. 9; Ex. 10; Ex. 11].

Lund's willingness to lie in court documents continued for years.  In November 2013, in *Lund v. United States of America*, Case No. 13-35321, Lund wanted to appeal Judge Aiken's

order reducing his 1994, 1995, and 1996 tax liabilities to judgment,[21] and he filed an Affidavit

Accompanying Motion for Permission to Appeal In Forma Pauperis. [Ex. 94]. Lund declared he

was unable to pay the required filing fees and he answered the application's questions about his

income and assets. [*Id.*]. Despite making over $8,000 per month, Lund declared under penalty

of perjury that he made $976 per month in "self-employment" and $313 per month in "food

stamps." [*Id.*; Ex. 76]. Although he had numerous nominee bank accounts, he declared that he

had his wife had $75 "in bank accounts or in any other financial institutions." [Ex. 94]. And

despite owning five properties, Lund declared he owned no real estate and that he rented a home.

[*Id.*]. At the end of the application, Lund stated "our finances have been severely reduced; we

have cut expenses to the bone." [*Id.*].

Three months later, in *United States of America v. Lund*, Case No. 13-36057, after the

Ninth Circuit denied Lund's appeal of the District Court's order reducing his 1994, 1995, and

1996 tax liabilities to judgment, Lund filed another Affidavit Accompanying Motion for

Permission to Appeal In Forma Pauperis that was identical in all respects except he declared

under penalty of perjury that he made $810 per month in "self-employment" and "$300+? [but

maybe] a bit higher like maybe $470?" per month in public-assistance. [Ex. 95; *see also* Ex. 76

(showing Lund made $8,169 in November 2013 and $12,024 in June 2014)].

In addition to his lies in court documents, Lund's *pro se* filings in this case show his

disrespect for the court and government resources. In July 2019, Lund delivered to the United

---

[21] After Lund flummoxed the IRS for years, in January 2012 the IRS (with the assistance of a
civil attorney from the Department of Justice's Tax Division) filed a complaint in U.S. District
Court in Eugene to reduce to judgment Lund's tax liability for 1994, 1995, and 1996. [Ex. 92].
In August 2013, District Judge Ann Aiken issued a decision saying Lund owed the IRS
$1,528,741.29 as of October 2012. [Ex. 93].

States Attorney's Office (and others)[22] a 92-page document saying this Court had no jurisdiction over him because, among other reasons, he was an "ambassador of Christ." As "Minister Robert Andrew Lund, C.S.", he proceeded to file a motion to dismiss raising a host of claims, including:

- Because Lund is a self-styled "Ambassador of Christ" only the Supreme Court of the United States has jurisdiction to hear these cases;

- Lund's Creator did not grant other men authority to exercise dominion over him;

- The federal government and this Court have no authority to operate outside the District of Columbia;

- Lund does not reside in "federal territory," instead, he resides in the "Republic of Oregon," a place where the federal government and federal courts have no jurisdiction over him;

- The Court has no jurisdiction over "tax related matters";

- Lund is a "Sovereign, Natural Born man" who exists on "Private Property", so the federal government and federal courts have no jurisdiction over him; and

- Title 18, United States Code, Section 3231 grants criminal jurisdiction to a "district court of the United States" but does not grant criminal jurisdiction to this Court, which is a "United States District Court."

[Dkt. No. 14 (18-cr-180); Dkt. No. 18 (19-cr-244)]. These frivolous arguments provide the Court additional insight into who Lund really is.

/ / /

/ / /

/ / /

---

[22] The documents indicate they were delivered to at least 30 other individuals and agencies, including then-Attorney General William Barr, the Supreme Court of the United States, the Criminal and Tax Divisions, the Executive Office of United States Attorneys, the Department of the Treasury, the U.S. Marshall's Office (headquarters and in the District of Oregon), various judges in this Court, the Office of Grand Jury Foreman, U.S. Probation and Parole, the Public Defender's Office, and the Committee on Criminal Law of the Judicial Conference of the United States.

## VIII.   PROMOTE RESPECT FOR THE LAW AND AFFORD ADEQUATE DETERRENCE

The Introductory Commentary to the tax sentencing guidelines emphasizes that criminal tax prosecutions promote respect for the tax laws and that "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."

As discussed immediately below, Lund is, measured by tax loss, the most significant tax evader to plead guilty in this district in the last 15 years.  His sentence must reflect this to deter others.

## IX.   AVOID UNWARRANTED SENTENCING DISPARITIES

Over the last 15 years, judges in this district have sentenced 27 defendants in cases where tax evasion was the only crime or in which tax evasion was charged and played a significant role. [*See* Ex. 96].  21 of these defendants pleaded guilty while 6 were convicted after a trial.

Not surprisingly, the tax evasion defendants convicted at trial were all sentenced to substantial terms of imprisonment, most at or near the top of the 60-month maximum for tax evasion.  But more helpful for comparison with defendant Lund, every tax evasion defendant who pleaded guilty and did not have significant mitigating factors—low tax loss, cooperation with the government, family issues, extraordinary acceptance of responsibility, imprisonment in a foreign country—was sentenced to a long term of imprisonment.

Lund's admitted tax loss—$1,745,710.06—is significantly higher than that of all 21 previous tax evasion defendants who have pleaded guilty.  The next highest loss is defendant

Bruce Lamon at $744,339, over a million dollars less than Lund's admitted tax loss, and Lamon was sentenced to 24 months imprisonment. Several defendants with significant mitigating factors but with tax loss over a million dollars less than Lund's —Vanagas ($677,000), Ngo ($502,000), Cardwell (William) ($197,000), Brill ($314,000), Henriksen ($368,000), Thompson ($159,000)—were still sentenced to prison terms longer than one year: 15 months imprisonment (Ngo); 12 months and one day imprisonment (the others).

## X. OBJECTIONS TO PRESENTENCE REPORT

On August 31, 2021, United States Probation Officer Woermbke requested that the parties waive the objection period to the presentence report and raise any objections at sentencing. Defendant waived this objection period and the government did not have the opportunity to submit its objections before the submission of the final report. The Probation Office has agreed the government should include its objections and suggested corrections to the September 30, 2021 presentence report here.

First, the government objects that paragraphs 46 and 58 recommend a one-level reduction for acceptance of responsibility under USSG § 3E1.1(b). This recommendation is "[b]ased on the defendant's statement, timely entry of a guilty plea, and the government's anticipated motion" and the determination that Lund "has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea." *See* paras. 46, 58. As explained *supra* in Acceptance of Responsibility, Lund did not timely notify the government of his intention to enter a plea of guilty and did not permit the government to avoid preparing for trial. Lund plead guilty a week after the government filed its first set of pre-trial documents and had already engaged in meaningful trial preparation. Because

the government was trial-ready, Lund is not entitled to the one-level reduction for acceptance of responsibility under USSC § 3E1.1(b).

Second, the government objects that paragraph 76 of the presentence report ("Assets") only identifies Lund's home as real property. Despite recognizing that Lund repeatedly transferred four other real properties[23] he owned to evade payment of personal income taxes, the presentence report neglects to identify those property as Lund's assets. *See e.g.*, paras. 33-39. While the government has no information regarding the value of the trailer park, the Pine Street home, or the Mountain Man Lane home, in May 2012, the 240 2nd Ave. property was appraised for $450,000. [Ex. 67]. The government requests that these four properties all be listed as Lund's assets in paragraph 76 of the presentence report.

## XI. GUIDELINE CALCULATIONS

The following advisory Guideline provisions apply to this case:

Indictment Count 1:

| Guideline Section | Offense Level |
| --- | --- |
| 2T4.1(1), tax loss of $1,745,710.06 | 22 |
| 2T1.1(b)(2), sophisticated means | 2 |

Indictment Count 2:

| Guideline Section | Offense Level |
| --- | --- |
| 2T4.1(D), tax loss of $33,968 | 12 |
| 2T1.1(b)(2), sophisticated means | 2 |

---

[23] The four other real properties are 240 2nd Ave. SW, Albany, OR, 329 Pine St. SE, Albany, OR, 4610 Highway 20, Sweet Home, OR, and 38960 Mountain Man Lane, Lebanon, OR.

Indictment Count 3:

| Guideline Section | Offense Level |
| --- | --- |
| 2T4.1(D), tax loss of $33,829 | 12 |
| 2T1.1(b)(2), sophisticated means | 2 |

Indictment Counts 5 and 6:

| Guideline Section | Offense Level |
| --- | --- |
| 2B1.1(a)(2), base offense level | 6 |
| 2B1.1(b)(1)(D), loss of $70,098.35 | 6 |

Counts 1, 2, 3, 5, and 6 should be grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, and that loss is comprised of different types of federal funds/purpose of depriving the federal government of funds. *See* USSG § 3D1.2.[24]

The Court should find that the offenses group and should adopt the following advisory sentencing guidelines calculation:

| Guideline Section | Offense Level |
| --- | --- |
| 2T4.1(1), tax loss of $1,745,710.06 | 22 |
| 2T1.1(b)(2), sophisticated means | +2 |
| 3E1.1(a), acceptance of responsibility | -2 |
| **Final Offense Level** | **22 (41 to 51 months)** |

/ / /

/ / /

[24] Even if the Court finds that Counts 1, 2, 3, 5, and 6, should not be grouped, Counts 2, 3, 5, and 6 are all 9 or more levels less than Count 1, which has the highest offense level. Pursuant to USSG § 3D1.4(c), they must be disregarded and Count 1 will control.

## XII.    RESTITUTION

The Court should order Lund to pay $1,745,710.06 to the IRS and $70,098.35 to the

Oregon Department of Human Services.

## XIII.    CONCLUSION

Based on the foregoing, the government respectfully requests that the Court sentence

Robert A. Lund to 41 months imprisonment, payment of restitution of $1,745,710.06 to the IRS,

payment of restitution of $70,098.35 in restitution to the Oregon Department of Human Services,

and payment of the $100 special assessment per count.  The government also requests that the

Court impose three years of supervised release.

Dated: November 10, 2021                          Respectfully submitted,

                                                  SCOTT ERIK ASPHAUG
                                                  Acting United States Attorney

                                                  */s/ Meredith D.M. Bateman*
                                                  MEREDITH D.M. BATEMAN, OSB #192273
                                                  SETH D. URAM, DC #376214
                                                  Assistant United States Attorneys